# EXHIBIT A



**Executive Liability Division**
1515 Woodfield Road, Suite 500
Schaumburg, IL 60173-5437
Fax (513) 929-6890

June 30, 2016

MR NICK BOHLMAN
WELLS FARGO INS. SERVICES USA, INC.
400 HIGHWAY 169 SOUTH
ST. LOUIS PARK, MN 55426

RE:   OPENGATE CAPITAL MANAGEMENT, LLC
      Policy No.:        PEP2788708
      Policy Period:     6/25/2016 - 6/25/2017

Dear MR BOHLMAN:

Enclosed please find the original policy for the above mentioned Insured.  Thank you for choosing the Executive Liability Division for your client's insurance needs.  We appreciate your efforts in securing this placement and look forward to working with you again in the future.

Should you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Mark R. Hittle
Senior Underwriter II
(847) 330-6805
mhittle@gaig.com

Great American Insurance Company • Agricultural Insurance Company • Agricultural Excess and Surplus Insurance Company • American Alliance Insurance Company • American Dynasty Surplus Lines Insurance Company • American National Fire Insurance Company • American Spirit Insurance Company • Eagle American Insurance Company • Eden Park Insurance Company • Great American Lloyd's Insurance Company • Great Texas County Mutual Insurance Company • Seven Hills Insurance Company.

**MEMBERS OF AMERICAN FINANCIAL GROUP**                              A13002



**INSURANCE GROUP**

301 E. Fourth Street, Cincinnati, OH 45202

*ExecPro* <sup>sm</sup>

# DECLARATIONS
for
Private Equity Liability Insurance

Insurance is afforded by the company indicated below:  (Each a capital stock corporation)

☒ Great American E & S Insurance Company

Note:  The Insurance Company selected above shall herein be referred to as the **Insurer**.

Policy Number: PEP2788708                    Policy Form Number:   D18100-A

Note:  This is a  claims made policy, please read it carefully.  Amounts incurred as **Costs of Defense** shall  reduce the Limit of Liability available to pay judgments or settlements and shall also be applied against the retention.  This Policy does not provide for any duty by the **Insurer** to defend those insured under the Policy.

Item 1.  **Named Insured**:          OPENGATE CAPITAL MANAGEMENT, LLC

Mailing Address:          10250 CONSTELLATION BOULEVARD
                         LOS ANGELES, CA 90067

Attention:

Item 2.  **Policy Period**:          From:          6/25/2016          To:          6/25/2017
                                              *(Month, Day, Year)*                    *(Month, Day, Year)*
                    (Both dates at 12:01 a.m. Standard Time at the address of the **Corporation** as stated in Item 1)

Item 3.  Limit of Liability (Inclusive of **Costs of Defense**):

          $5,000,000          Aggregate Limit of Liability for the **Policy Period**

Item 4.  Retentions:

          Insuring Agreement A:          Each **Claim**:                              $0

          Insuring Agreements B:          Each **Claim** other than an **Employment Practices Claim**: $250,000
                                         Each **Employment Practices Claim**:          N/A

          Insuring Agreement C:          Each **Claim**:                              $0

Item 5.  Premium: (Prepaid)                                                    $72,500

Item 6.  Endorsements Attached

    D18351   D18419   D18703 (2)   D18703 (3)   D18712 (10)   D18712 (20)   D18712 (21)   D18819   DTCOV   IL7324

Item 7.  Prior and Pending Date  1/26/2009

Item 8.  **Discovery Period**
    (A)     Additional Premium     $72,500
    (B)     Additional Period       365 Days

Item 9.  Notices:  **Notice of Claim or Wrongful Act(s)** shall be addressed to:          All other notice shall be addressed to:
                  Great American Insurance Companies,                                    Great American Insurance Companies,
                  Attn: Claims Department                                                Executive Liability Division,
                  1515 Woodfield Road, Suite 500                                         P.O. Box 69943, Chicago, IL  60666
                  Schaumburg, IL  60173

These Declarations, along with the completed and signed Proposal Form and the *Private Equity Liability Insurance Policy*, shall constitute the contract between the **Insured** and the **Insurer**.

(Authorized Representative)                                        (Countersignature Date)

**Countersignature**
**Not Required**

**NOTICE:**

**1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

**2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

**3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

**4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.**

**5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT**

**STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

**6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

**7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.**

**8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**



*ExecPro*℠
Private Equity Liability
Insurance Policy

## SERVICE OF PROCESS ENDORSEMENT
### California

Pursuant to any statute of any state or district of the United States of America, which makes provisions therefore, the **Insurer** hereby designates the Commissioner, Superintendent or Director of Insurance or other officer specified for that purpose in the statute and his or her successors in office and duly authorized deputies in the state where this Policy is issued, as the **Insurer's** true and lawful attorney for service of legal process in any action, suit or proceeding brought in the state where this Policy is issued by or on behalf of an **Insured** or beneficiary against the **Insurer** arising out of the insurance issued under this Policy.  Any legal process received by such attorney for service of legal process shall be forwarded to the **Insurer** to the attention of:

> Eve Cutler Rosen
> General Counsel
> Great American Excess and Surplus Insurance Company
> 301 E. Fourth Street
> Cincinnati, OH 45202
>
> and
>
> Jere Keprios
> c/o The CT Corporation System
> 818 West Seventh Street
> Los Angeles, California 90017

---

Please note that the address stated above is only to be used in case of suits against the **Insurer** and by no means amends the provisions of the Policy for notice of **Claim** which is specified in Section VIII. of the Policy. Please use the address specified in the aforementioned section of the Policy for notice of all **Claims**.

---

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured:  OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:  6/25/2016 to Policy Expiration                    Policy Number:  PEP2788708

Countersigned by: _____                    Endorsement Effective Date:  6/25/2016
*Authorized Representative*



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

## PRIOR AND PENDING LITIGATION EXCLUSION
### (For Excess Limit of Liability)

As it respects the Limit of Liability $ __2,000,000__ excess of $ __3,000,000__ , it is understood and agreed that Item 7 of the Declarations is amended to read __4/5/2011__ .

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured:  OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:  6/25/2016 to Policy Expiration          Policy Number:  PEP2788708

Countersigned by: _____          Endorsement Effective Date:  6/25/2016
                  *Authorized Representative*

D 18419   (06/07)                                Endorsement:   2              Page 1 of 1



**ExecPro**<sup>sm</sup>
Private Equity Liability
Insurance Policy

## INSURED ORGANIZATION SCHEDULE

It is understood and agreed that Section III.I. of the Policy is deleted and replaced with the following:

    I.    "**Insured Organization**" means:

       (1)    the **Named Insured**;

       (2)    any **Operating Entity**; and

       (3)    any entity scheduled below:

          (a) OpenGate Capital Group, LLC

          (b) OpenGate Equity Partners, LLC

          (c) OpenGate Capital Group Europe SARL

          (d) OpenGate Capital Management Europe, SARL

          (e) OpenGate Capital UGP I, Ltd

          (f) OpenGate Capital GP I, LP

          (g) OpenGate Capital Partners I, LP

          (h) OpenGate Capital Partners I-A, LP;

     **Insured Organization** shall not include any **Portfolio Company**.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured:  OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:  6/25/2016 to Policy Expiration          Policy Number:  PEP2788708

Countersigned by: _____         Endorsement Effective Date:  6/25/2016
             *Authorized Representative*



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

## CO-DEFENDANT COVERAGE

It is understood and agreed that Section III.K. of the Policy is amended by the addition of the following:

**Insured(s)** shall also mean:

 Bay Bridge Ventures, LLC; AKN Holdings, LLC; Naxos Capital Partners, S.A.R.L; Syntagma Capital Limited;  and Next Step Consulting, S.A.R.L

and any directors, officers and employees of such entity(ies);

but only for **Claims**:  (1) arising out of any actual or alleged **Wrongful Acts** of any **Insured Organization** and/or **Insured Person**; and (2) made and continuously maintained against any **Insured Organization** and/or **Insured Person**.

This Policy does not provide coverage for any acts, errors or omissions of Bay Bridge Ventures, LLC; AKN Holdings, LLC; Naxos Capital Partners, S.A.R.L; Syntagma Capital Limited; and Next Step Consulting, S.A.R.L and/or any of its directors, officers, or employees in their respective capacities as such.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured:  OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:  6/25/2016 to Policy Expiration            Policy Number:  PEP2788708

Countersigned by:  _____            Endorsement Effective Date:  6/25/2016
                         *Authorized Representative*



**ExecPro**ˢᵐ
Private Equity Liability
Insurance Policy

# GENERAL AMENDATORY ENDORSEMENT

It is understood and agreed that the following changes are made to the Policy:

| Amendments to Definitions |
| --- |

1.   Section III. is amended by the addition of the following:

   "**Business Practices Wrongful Act**" means any actual or alleged act of discrimination, sexual harassment or the violation of any individual's civil rights related to such discrimination or sexual harassment;

   "**Controlling Person**" shall have the same meaning as set forth in Section 15 of the Securities Act of 1933, Section 20 (a) of the Securities Exchange Act of 1934 or any equivalent legislation, rules, or regulations of any foreign governmental authority;

   "**Extradition**" means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation;

   "**Investigation**" means any civil, criminal, administrative or regulatory investigation of an **Insured** by a federal, state, local, foreign or offshore government authority or agency (including without limitation an investigation by the Equal Employment Opportunity Commission, Securities and Exchange Commission, Commodity Futures Trading Commission, Department of Justice, Department of the Treasury, Department of Labor, PensionBenefit Guarantee Corporation, the Financial Services Authority or Grand Jury) or **Self-Regulatory Organization** but only after receipt or service of a formal order of investigation or matter under inquiry, subpoena, grand-jury subpoena, receipt of a Wells Notice, receipt of a target letter (within the meaning of Title 9-11.151 of the United States Attorney's Manual), civil investigative demand, search warrant or similar document; provided, however, an **Investigation** shall not include any routine industry sweeps, examinations, audits, inspections or similar reviews or inquiries, deficiency letters or general requests for information;

   "**Pollutants**" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, asbestos, chemicals or waste of any kind, including any materials to be recycled, reconditioned or reclaimed;

---

Insured:   OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:   6/25/2016 to Policy Expiration          Policy Number:   PEP2788708

Countersigned by:   _____          Endorsement Effective Date:   6/25/2016
               *Authorized Representative*

D18712(10)        (12/15)                              Endorsement:        5Page 1 of 9



*ExecPro*℠
Private Equity Liability
Insurance Policy

# GENERAL AMENDATORY ENDORSEMENT

"**Securities Claim**" means any **Claim** (including a civil lawsuit or criminal proceeding brought by the Securities and Exchange Commission) made against an **Insured** alleging a violation of any law, regulation or rule, whether statutory or common law, which is:

(1)     brought by any person or entity alleging, arising out of , based upon or attributable to, in part or in whole, the: (a) purchase or sale of, or (b) offer or solicitation of an offer to purchase or sell, any securities of an **Insured Organization** or a **Portfolio Company**; or

(2)     brought by a security holder of an **Insured Organization** or a **Portfolio Company**, arising solely with respect to such security holder's interest in such securities of the **Insured Organization** or the **Portfolio Company**, whether directly, by class action, or derivatively on behalf of the **Insured Organization** or the **Portfolio Company**;

"**SOX 304/Dodd-Frank 954 Costs**" means the reasonable and necessary fees, costs and expenses (including the premium or origination fee for a loan or bond) consented to by the **Insurer** and incurred by any **Insured Person** solely to facilitate the return of amounts required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010; provided, however, **SOX 304/Dodd-Frank 954 Costs** shall not include any payment, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010;

"**Third Party Claim**" means any **Claim** brought by a customer, client, supplier, distributor, or independent contractor of the **Insured Organization**, or any other individual or group of individuals for any **Business Practices Wrongful Act**.

2.     Section III. A. is deleted and replaced with the following:

**A.**     "**Claim**" means:

(1)     a written demand for monetary, non-monetary or injunctive relief against an **Insured** commenced by such **Insured's** receipt of such demand;

(2)     an administrative, regulatory, arbitration or other alternative dispute resolution proceeding including but not limited to a proceeding before the Equal Employment Opportunity Commission, any **Self-Regulatory Organization** or similar state agency, initiated against any **Insured** commenced by such **Insured's** receipt of a demand for alternative dispute resolution, arbitration, notice of charges, formal investigative order or similar document;



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

# GENERAL AMENDATORY ENDORSEMENT

 (3) a criminal or civil proceeding including any appeal therefrom made against any **Insured** and commenced by the return of an indictment, similar charging document, service of a complaint, pleading or similar document;

 (4) a written agreement to toll any applicable statute of limitations prior to the commencement of any judicial, administrative, regulatory or arbitration proceeding;

 (5) any **Investigation**;

 (6) an **Employment Practices Claim**;

 (7) an official request for **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**;

 (8) **Third Party Claim**; or

 (9) **Securities Claim**.

3. Section III. B. is amended by the addition of the following:

Solely with respect to any **Extradition**, **Costs of Defense** shall also mean reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

 (a) opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

 (b) appealing any order or other grant of **Extradition** of that **Insured Person**.

4. Section III. F. is deleted and replaced with the following:

 **F.** "**Executive Officer**" means the functional equivalent of a chief financial officer or in-house general counsel, regardless of the actual title or position.

5. Section III. J.(3) is deleted and replaced with the following:

 (3) any natural person other than a director, officer, general partner, manager, equivalent executive or employee of an **Insured Organization**; provided, however, the **Insured Organization** has agreed to indemnify such natural person for any **Wrongful Act(s)**.



**ExecPro**℠
Private Equity Liability
Insurance Policy

## GENERAL AMENDATORY ENDORSEMENT

6.   Section III. M. is deleted and replaced with the following:

**M.**   "**Investment Fund**" means:

(1)   any **Organization** that is a pooled investment vehicle which is created or established prior to or during the **Policy Period** by an **Insured Organization**; or

(2)   any **Organization** which is created or established prior to or during the **Policy Period** for the purpose of monitoring, liquidating, dissolving or winding down an **Organization** identified in subsection (1) above or for the purpose of holding investments in connection with monitoring, liquidating, dissolving or winding down such an **Organization** identified in subsection (1) above.

7.   Section III. N. is deleted and replaced with the following:

**N.**   "**Loss**" means compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, **SOX 304/Dodd-Frank 954 Costs**, settlements, pre-judgment interest, post-judgment interest and **Costs of Defense.**

It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

"**Loss**", other than **Costs of Defense**, shall not include:

(1)   criminal or civil fines or penalties imposed by law, or taxes;

(2)   any matter which may be deemed uninsurable under the law pursuant to which this Policy is construed;

(3)   non-monetary relief;

(4)   employment-related benefits, stock options, perquisites, deferred compensation, severance, or any other type of compensation other than front pay or back pay;

(5)   any portion of damages, judgments, or settlements arising out of any **Claim** alleging the **Insured Organization** paid an inadequate price or consideration for any securities; or



ExecPro℠
Private Equity Liability
Insurance Policy

# GENERAL AMENDATORY ENDORSEMENT

(6)    costs incurred in connection with cleaning up, removing, eliminating, abating, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**.

Notwithstanding sub-paragraph (2) above, in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, the **Insurer** shall not assert the portion of any amounts incurred by any **Insureds** attributable to such violations constitutes uninsurable loss and shall treat that portion of all settlements, judgments and **Costs of Defense** as constituting **Loss** under the Policy.

Further, notwithstanding subparagraphs (1) and (2) above and solely with respect to coverage provided by Insuring Agreement I.A., "**Loss**" shall also mean civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the U.S. Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B).

8.    Section III. Y. is deleted and replaced with the following:

**Y.**    "**Wrongful Act**" means any actual or alleged **Employment Practices Wrongful Act** or error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:

(1)    by the **Insured Persons**, in their capacity as such;

(2)    with respect to Insuring Agreement I.B.(2) by the **Insured Organization**;

(3)    with respect to Insuring Agreement I.C. by the **Insured Persons** while serving in an **Outside Position**; or

(4)    by an **Insured** solely by reason of their status as a **Controlling Person** or as a selling shareholder.

With respect to (1) and (2) above, **Wrongful Act** shall also include any **Business Practices Wrongful Act**.



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

# GENERAL AMENDATORY ENDORSEMENT

| Amendments to Exclusions |
| --- |

1.      Section IV. A. is deleted and replaced with the following:

**A.**      for any actual or alleged:

(1)      bodily injury, sickness, disease, or death of any person;

(2)      damage to or destruction of any tangible property, including the loss of use thereof; or

(3)      mental anguish, emotional distress, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel or slander; provided, however, that part (3) of this exclusion shall not apply to:

(a)      any **Employment Practices Claim**; or

(b)      any **Third Party Claim**;

2.      Section IV. C.(1) is deleted and replaced with the following:

(1)      brought by any security holder of an **Insured Organization** whether directly or derivatively, if the security holder bringing such **Claim** is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any **Insured**;

For the purposes of Section IV.C.(1), where one or more security holders allege, certify or affirm there is likely support for their **Claim** by referring to any of the following actions taken by an **Insured Person**, such allegations, certification or affirmation shall not, in itself, demonstrate such security holder is not "acting totally independent of, and without solicitation, assistance, active participation or intervention of any **Insured**:

(a)      providing information to, causing information to be provided to, or otherwise assisting in an investigation conducted by a federal regulatory agency, a federal law enforcement agency, or any member or committee of the United States Congress regarding the possible violation by an **Insured** of the laws, rules, and regulations listed in 18 U.S.C. 1514A(a)(2);

(b)      filing, causing to be filed, testifying, participating in, or otherwise assisting in a proceeding relating to the possible violation by an **Insured** of laws, rules, and regulations listed in 18 U.S.C. 1514A(a)(2);



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

## GENERAL AMENDATORY ENDORSEMENT

(c)     filing a complaint with the United States Secretary of Labor, as authorized by 18 U.S.C. 1514A(b)(1)(A); or

(d)     bringing an action at law or equity to the extent that such action seeks relief pursuant to 18 U.S.C. 1514A(b)(1)(B).

3.     Section IV. D. is deleted and replaced with the following:

**D.**     brought about or contributed to by:

(1)     any **Insureds** gaining any profit, advantage or remuneration to which they were not legally entitled; or

(2)     the deliberately fraudulent or criminal acts of any **Insureds**;

provided, however, this exclusion shall only apply if it is established by any final, non-appealable adjudication in the underlying proceeding that such conduct in fact occurred; and this exclusion shall not apply to coverage provided under Insuring Agreement I.B.(1);

4.     Section IV. E. is deleted in its entirety.

5.     Section IV. G. is deleted and replaced with the following:

**G.**     for any **Wrongful Act** of any **Insureds** in connection with the activities of any **Insured(s)** as a fiduciary for, or in the administration of, any pension or welfare plans of an **Insured Organization**;

6.     Section IV. J. is deleted and replaced with the following:

**J.**     solely with respect to the **Insured Organization**, for, based upon, arising from, or in any way related to any actual or alleged breach of a written contract or agreement; provided, however, this exclusion shall not apply to:

(1)     liability for **Loss** which would have attached even in the absence of such contract or agreement;

(2)     any actual or alleged breach of any contract describing or calling for **Professional Services**;

(3)     any indemnification obligation between an **Insured Organization** and an **Insured Person**;



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

# GENERAL AMENDATORY ENDORSEMENT

(4)      any actual or alleged breach of an **Insured Organization's** partnership agreement, articles of incorporation, by-laws, trust indenture, limited partnership agreement, operating agreement or similar organizational or constituting document; or

(5)      **Costs of Defense** for a **Claim** alleging a failure by an **Insured Organization** to fund a **Portfolio Company**;

7.     Section IV. M. is deleted and replaced with the following:

**M.**     for any actual or alleged violation by an **Insured** of workers' compensation, unemployment compensation, disability benefits, or social security laws, or Fair Labor Standards Act, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act of 1970, the Workers' Adjustment and Retraining Notification Act, or any similar federal, state, local or foreign law except a **Claim** alleging retaliation for the exercise of any rights under such laws.

| Supplemental Coverage for UK Corporate Manslaughter Act Investigation Costs |
| --- |

Section IX. is amended by the addition of the following:

### Supplemental Coverage for UK Corporate Manslaughter Act Investigation Costs

The **Insurer** shall, subject to prior written consent, pay on behalf of or reimburse an **Insured Person** for reasonable and necessary costs and expenses that result solely from the investigation, adjustment, defense and/or appeal of a **Claim** against the **Insured Organization** for any actual or alleged violations of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any jurisdiction, provided, however, such costs and expenses shall not include any salary, wages, overhead or benefit expenses associated with such **Insured Person**. Any payment pursuant to this supplemental coverage shall be considered **Loss** for purposes of the exhaustion of the Limit of Liability and shall be subject to the applicable Retention. In the event the **Insured Person** is not indemnified by the **Insured Organization** for any reason, the **Insurer** shall advance payment hereunder without requiring payment of the Retention.

| Amendment to Subrogation |
| --- |

Section IX. F. is deleted and replaced with the following:



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

## GENERAL AMENDATORY ENDORSEMENT

**F**.    **Subrogation**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all of the **Insureds'** respective rights of recovery and the **Insured Organization** and **Insured Persons** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the **Insurer** to effectively bring suit in the name of any **Insured Persons** or the **Insured Organization**.

The **Insurer** shall only exercise its rights of subrogation against an **Insured** under this Policy if Section IV. D.(Conduct Exclusion) applies to such **Insured**.

| Amendment to Representations and Severability |
| --- |

Section IX. N. (5) is deleted and replaced with the following:

(5)    The Policy shall not be rescinded by the **Insurer**.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.



*ExecPro*ˢᵐ
Private Equity Liability
Insurance Policy

## SHAREHOLDER DERIVATIVE DEMAND
## COVERAGE ENDORSEMENT

It is understood and agreed that the following changes are made to the Policy:

| AMENDMENT TO INSURING AGREEMENTS |
| --- |

Section I. is amended by the addition of the following:

The **Insurer** shall pay on behalf of the **Insured Organization** all **Investigative Costs** resulting from any **Shareholder Derivative Demand** first made during the **Policy Period** or the **Discovery Period** for any actual or alleged **Wrongful Act** of a **Insured Person**.

| AMENDMENT TO DEFINITIONS |
| --- |

1. Section III. is amended by the addition of the following:

   "**Shareholder Derivative Demand**" means a written demand by one or more shareholders of the **Insured Organization**, upon the Board of Directors (or similar management body or any committee thereof) of the **Insured Organization** to initiate a civil proceeding in a court of law against any individual **Insured Person**.

   "**Investigative Costs**" means reasonable and necessary costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the **Directors, Officers**, or employees of the **Insured Organization**) incurred by the **Insured Organization** (including its Board of Directors or similar management body or any committee thereof) in connection with the investigation or evaluation of any **Shareholder Derivative Demand**.

2. Section III.A. is amended by the addition of the following:

   **Claim** also means a **Shareholder Derivative Demand**;

3. Section III.N. is amended by the addition of the following:

   **Loss** also means **Investigative Costs**;

Insured:  OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:  6/25/2016 to Policy Expiration          Policy Number:  PEP2788708

Countersigned by: _____          Endorsement Effective Date:  6/25/2016
                        *Authorized Representative*



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

## SHAREHOLDER DERIVATIVE DEMAND
## COVERAGE ENDORSEMENT

| AMENDMENT TO RETENTION |
| --- |

Section VI. is amended by the addition of the following:

    **D.**      Coverage for **Investigative Costs** shall not be subject to any Retention;

| AMENDMENT TO DECLARATIONS |
| --- |

Item 3. of the Declarations is deleted and replaced with the following:

    Item 3.      Limit of Liability (Inclusive of **Costs of Defense**):

        (a) $ <u>5,000,000</u>      Aggregate Limit of Liability for the **Policy Period**

        (b) $ <u>250,000</u>      SubLimit of Liability for **Investigative Costs** for any **Shareholder Derivative Demand**.  This sublimit is part of and not in addition to the Limit of Liability stated in Item 3(a).

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

## DELETION OF EMPLOYMENT PRACTICES LIABILITY COVERAGE ENDORSEMENT

It is understood and agreed that the following changes are made to the Policy:

| AMENDMENT TO THE DECLARATIONS |
|---|

Item 4. of the Declarations is amended as follows:

Item 4.    **Retentions**:

| Insuring Agreement A: | Each **Claim** | $ 0 |
|---|---|---|
| Insuring Agreement B: | Each **Claim**: | $ 250,000 |
| Insuring Agreement C: | Each **Claim**; | $ 0 |

| AMENDMENT TO DEFINITIONS |
|---|

1.    Section III.A.(6) is deleted in its entirety.

2.    Section III.D. is deleted in its entirety.

3.    Section III.Y. is deleted and replaced with the following:

**Y.**    "**Wrongful Act**" means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:

(1)    by the **Insured Persons**, in their capacity as such;

(2)    with respect to Insuring Agreement (B)(2), by the **Insured Organization**;

(3)    with respect to Insuring Agreement (C), by the **Insured Persons** while serving in an **Outside Position**; or

Insured:   OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:   6/25/2016 to Policy Expiration

Policy Number:  PEP2788708

Countersigned by:   _____
             *Authorized Representative*

Endorsement Effective Date:   6/25/2016



*ExecPro*<sup>sm</sup>

Private Equity Liability
Insurance Policy

## DELETION OF EMPLOYMENT PRACTICES LIABILITY
## COVERAGE ENDORSEMENT

    (4)      by an **Insured** solely by reason of their status as a **Controlling Person** or as a selling shareholder.

With respect to (1) and (2) above, **Wrongful Act** shall also include any **Business Practices Wrongful Act**.

| AMENDMENT TO EXCLUSIONS |
| --- |

Section IV. is amended by the addition of the following:

based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any **Employment Practices Wrongful Act**;

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.



*ExecPro*<sup>sm</sup>
Private Equity Liability
Insurance Policy

## ATTACHMENT OF COMPETITOR'S PROPOSAL FORM

It is understood and agreed that Section III.W. of the Policy is hereby amended by the addition of the following:

Section III.W.   It is agreed by the **Insured Organization** and the **Insured Persons** that the following document shall be considered a **Proposal Form** as outlined above:

PEN 2200 (10/07)   as signed and dated on   6/23/2016   .

It is further understood and agreed that the **Proposal Form** (which shall be on file with the **Insurer** and be deemed attached hereto as if physically attached hereto), is the basis of this Policy and is to be considered as incorporated in and constituting a part of this Policy.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured:  OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:  6/25/2016 to Policy Expiration          Policy Number:  PEP2788708

Countersigned by: _____          Endorsement Effective Date:  6/25/2016
                       *Authorized Representative*

D 18819   (06/07)                         Endorsement:  8               Page 1 of 1



# TERRORISM COVERAGE ENDORSEMENT
# CAP ON LOSS FROM CERTIFIED ACTS

Subject to all terms and conditions of this Policy, including any follow-form provisions, this Policy is amended by the addition of the following:

**CERTIFIED ACTS OF TERRORISM COVERAGE**

"Certified Act of Terrorism" means an act that is certified by the Secretary of the Treasury in accordance with the provisions of the Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "Certified Act of Terrorism" include the following:

1.  the act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

If the aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year in the aggregate and the Insurer has met its deductible under the Terrorism Risk Insurance Act, the Insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rate allocation in accordance with procedures established by the Secretary of the Treasury.

---

It is understood and agreed that the Premium section of the Declarations is amended by the addition of the following:

Terrorism Premium: $  0.00

The Policyholder Disclosure Offer of Terrorism Coverage is attached to and is to be considered as incorporated in and constituting a part of this Policy.

---

This endorsement does not extend any additional coverage or otherwise change the terms and conditions of any coverage under this Policy.

---

Insured:  OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:  6/25/2016 to Policy Expiration                 Policy Number:  PEP2788708

Countersigned by: _____                 Endorsement Effective Date:   6/25/2016
                              *Authorized Representative*



# ECONOMIC AND TRADE SANCTIONS CLAUSE

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

Insured:   OPENGATE CAPITAL MANAGEMENT, LLC

Policy Period:   6/25/2016 to Policy Expiration

Countersigned by: _____
*Authorized Representative*

Policy Number:   PEP2788708

Endorsement Effective Date:   6/25/2016

IL 73 24  (Ed. 08/12)                          Endorsement:   10                          Page 1 of 1



# POLICYHOLDER DISCLOSURE
# OFFER OF TERRORISM COVERAGE

The Terrorism Risk Insurance Act establishes a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. The Act provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals as part of an effort to coerce the government or population of the United States.

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program.  The federal share equals a percentage of that portion of the amount of such insured losses that exceeds the applicable insurer retention. The federal share percentage is dependent upon the calendar year and is shown in the Table below.

| Year | Federal Share |
|------|---------------|
| 2015 | 85% |
| 2016 | 84% |
| 2017 | 83% |
| 2018 | 82% |
| 2019 | 81% |
| 2020 | 80% |

The Terrorism Risk Insurance Act, as amended in 2015, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion.  If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

In accordance with the Terrorism Risk Insurance Act, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism.   The policy's other provisions will still apply to such an act.

**Terrorism coverage** for acts of terrorism that are certified under the federal program as an act of terrorism is included for no additional premium.  Nonetheless, if you would like to reject such Terrorism coverage, please provide Great American written confirmation of such, and an exclusion will be attached to your policy.



Great American E&S Insurance Company

# ExecPro®

Private Equity Liability Insurance

# *ExecPro* ®

**Private Equity Liability Insurance Policy**

Great American E&S Insurance Company - Executive Liability Division:
1515 Woodfield Road, Suite 500, Schaumburg, IL 60173

# Table of Contents

| | | | |
|---|---|---|---|
| I. | | Insuring Agreement | Page 1 |
| II. | | Discovery Period | Page 1 |
| III. | | Definitions | Page 2 |
| IV. | | Exclusions | Page 6 |
| V. | | Limit of Liability | Page 9 |
| VI. | | Retention | Page 9 |
| VII. | | Costs of Defense and Settlements | Page 9 |
| VIII. | | Notice of Claim | Page 10 |
| IX. | | General Conditions | Page 11 |
| | (A) | Cancellation or Non-Renewal | Page 11 |
| | (B) | Action Against the Insurer | Page 11 |
| | (C) | Merger or Acquisition | Page 11 |
| | (D) | Run-Off Coverage | Page 11 |
| | (E) | Coverage Extensions | Page 12 |
| | (F) | Subrogation | Page 13 |
| | (G) | Allocation | Page 13 |
| | (H) | Assignment | Page 13 |
| | (I) | Conformity to Statute | Page 14 |
| | (J) | Entire Agreement | Page 14 |
| | (K) | Named Insured Represents Insured | Page 14 |
| | (L) | Representative of the Insurer | Page 14 |
| | (M) | Order of Payments | Page 14 |
| | (N) | Representations and Severability | Page 14 |

## GREAT AMERICAN INSURANCE GROUP®

**Headquarters: 301 E. Fourth Street, Cincinnati, Ohio 45202**

## THIS IS A CLAIMS MADE POLICY.  READ IT CAREFULLY

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (a stock insurance company, hereinafter called the **Insurer**), including the statements made in the **Proposal Form** and subject to all terms, conditions and limitations of this Policy, the **Insured** and the **Insurer** agree:

## Section I.  Insuring Agreements

**A.**     Except for **Loss** which the **Insurer** pays pursuant to Sections I.B. or I.C. of this Policy, the **Insurer** will pay on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**B.**     The **Insurer** will pay on behalf of the **Insured Organization**:

(1)     **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** but only to the extent an **Insured Organization** is permitted or required by law to indemnify such **Insured Persons**; or

(2)     **Loss** which the **Insured Organization** becomes legally obligated to pay as a result of a **Claim** first made against the **Insured Organization**;

provided that such **Claim** is first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**C.**     Except for **Loss** which the **Insurer** pays pursuant to Sections I.A. and I.B. and subject to all of this Policy's terms and conditions, the **Insurer** will pay on behalf of the **Insured Persons** serving in an **Outside Position** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Person** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**; provided, however, that such coverage shall be specifically excess of any indemnity and/or valid and collectible insurance available from or provided by the entity in which the **Insured Person** serves in such **Outside Position**.

## Section II. Discovery Period

**A.**     In the event the **Insurer** refuses to renew this Policy or the **Named Insured** chooses to cancel or not renew this Policy, the **Named Insured** shall have the right, upon payment of the Additional Premium stated in Item 8(A) of the Declarations, to an extension of the coverage provided by this Policy with respect to any **Claim** first made against any **Insured** during the Additional Period of time stated in Item 8(B) of the Declarations following the effective date of such cancellation or non-renewal, but only with respect to any **Wrongful Act** committed or alleged to have been committed before the effective date of such cancellation or non-renewal.

**B.**     As a condition precedent to the right to purchase the **Discovery Period**, the total premium for this Policy must have been paid, and a written request together with payment of the appropriate premium for the **Discovery Period** must be provided to the **Insurer** no later than thirty (30) days after the end of the **Policy Period**.

**C.**     The fact that the coverage provided by this Policy may be extended by virtue of the purchase of the **Discovery Period** shall not in any way increase the Limit of Liability stated in Item 3 of the Declarations.  For purposes of the Limit of Liability, the **Discovery Period** is considered to be part of, and not in addition to, the **Policy Period**.

## Section III.     Definitions

**A.**     "**Claim**" means:

   (1)     a written demand for monetary or non-monetary relief against an **Insured** commenced by such **Insured's** receipt of such demand;

   (2)     an administrative, regulatory, or arbitration proceeding including but not limited to a proceeding before the Equal Employment Opportunity Commission, any **Self-Regulatory Organization** or similar state agency, initiated against any **Insured** commenced by such **Insured's** receipt of a demand for arbitration, notice of charges, formal investigative order or similar document;

   (3)     a criminal or civil proceeding including any appeal therefrom made against any **Insured** and commenced by the return of an indictment, similar charging document, service of a complaint, pleading or similar document;

   (4)     a written agreement to toll any applicable statute of limitations prior to the commencement of any judicial, administrative, regulatory or arbitration proceeding;

   (5)     any civil, criminal, administrative or regulatory investigation of an **Insured** by a federal, state, local or foreign government authority or agency (including without limitation an investigation by the Equal Employment Opportunity Commission, Securities and Exchange Commission, Commodity Futures Trading Commission, Department of Justice, Department of the Treasury, Department of Labor, Pension Benefit Guarantee Corporation, the Financial Services Authority or Grand Jury) or **Self-Regulatory Organization** but only after service of a subpoena, receipt of a Wells Notice, receipt of a target letter or receipt of a formal order of investigation; or

   (6)     an **Employment Practices Claim**.

**B.**     "**Costs of Defense**" means reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense or appeal of any **Claim** including the costs of an appeal bond, attachment bond or similar bond (but without obligation on the part of the **Insurer** to apply for or furnish such bonds); provided, however, **Costs of Defense** shall not include salaries, wages, overhead or benefit expenses associated with any **Insured Persons**.

**C.**     "**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

**D.**     "**Employment Practices Claim**" means any **Claim** brought by or on behalf of any past, present or future employee of an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity**, or any applicant for employment with an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity** alleging an **Employment Practices Wrongful Act**.

E.       **"Employment Practices Wrongful Act**" means:

(1)      wrongful dismissal, discharge or termination of employment, whether actual or constructive;

(2)      employment related misrepresentation;

(3)      sexual or workplace harassment of any kind;

(4)      discrimination;

(5)      wrongful failure to employ or promote;

(6)      wrongful discipline;

(7)      wrongful deprivation of career opportunity, including defamatory statements made in connection with an employee reference;

(8)      failure to grant tenure;

(9)      negligent evaluation;

(10)     failure to provide adequate workplace or employment policies and procedures;

(11)     wrongful retaliation; or

(12)     employment related libel, slander, defamation, or invasion of privacy.

F.       **"Executive Officer"** means the functional equivalent of a chief executive officer, chief financial officer, or in-house general counsel, regardless of the actual title or position.

G.       "**Financial Insolvency**" means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Insured Organization**, or the **Insured Organization** becoming a debtor in possession.

H.       **"General Partner(s)"** means any natural person or organization identified as such in the limited partnership agreement of an **Operating Entity** formed as a limited partnership.

I.       "**Insured Organization**" means the **Named Insured** and any **Operating Entity**.  **Insured Organization** shall not include any **Portfolio Company**.

J.       "**Insured Person(s)**" means:

(1)      any natural person who was, is or shall become a director, officer, general partner, manager, equivalent executive or employee of an **Insured Organization**;

(2)      any natural person representative of an investor in an **Investment Fund** while serving in his or her capacity as a member of any advisory board or committee of an **Investment Fund**; or

(3)      any natural person other than a director, officer, general partner, manager, equivalent executive or employee of an **Insured Organization** while serving in an **Outside Position**; provided, however, the **Insured Organization** has agreed to indemnify such natural person for any **Wrongful Act(s)** while serving in such **Outside Position**.

K.       **"Insured(s)"** means the **Insured Persons** and the **Insured Organization**.

**L.**    "**Interrelated Wrongful Acts**" means **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision.

**M.**    "**Investment Fund**" means an **Organization** which is created or established prior to or during the **Policy Period** by an **Insured Organization** consisting of a sum of money whose principal is invested pursuant to the objectives set forth in such **Organization's** private placement, prospectus, or similar document.

**N.**    "**Loss**" means compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, settlements, pre-judgment interest, post-judgment interest and **Costs of Defense.**

It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

"**Loss**" shall not include:

(1)    taxes, fines or penalties, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

(2)    non-monetary relief;

(3)    employment-related benefits, stock options, perquisites, deferred compensation, severance, or any other type of compensation other than front pay or back pay; or

(4)    any portion of damages, judgments, or settlements arising out of any **Claim** alleging the **Insured Organization** paid an inadequate price or consideration for any securities.

**O.**    "**Named Insured**" means the entity named in Item 1 of the Declarations.

**P.**    "**Non-Profit Entity**" means any non-profit and/or eleemosynary organizations.

**Q.**    "**Operating Entity**" means any **Organization** (including any **Investment Fund** and its **General Partner(s)**) created or acquired prior to or during the **Policy Period** of which an **Insured** or several **Insured's** collectively possess, directly or indirectly, the power to control, manage or direct by reason of an **Insured's**:

(1)    ownership of greater than 50% voting securities in such **Organization**;

(2)    right to elect or appoint a majority of the directors, officers, trustees, trust managers, managers, members, **General Partner(s)**, partnership managers, or joint venture managers of such **Organization**; or

(3)    rights and obligations pursuant to a written agreement governing the management and operation of such **Organization**.

**Operating Entity** shall not include any **Organization** created or acquired by any **Insured Person(s)** where such **Organization**: (i) was not created or established in connection with or to support an **Investment Fund**; and (ii) the **Named Insured** is not responsible for the financial reporting and tax filings of such **Organization**.

**R.**    "**Organization**" means any corporation, trust, limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.  **Organization** shall also include any entity organized outside of the United States that is the functional equivalent of any corporation, trust, limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.

S.   **"Outside Position"** means the position of director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board or other equivalent executive or management position in any:

(1)   **Portfolio Company**;

(2)   **Non-Profit Entity**; or

(3)   other entity specifically scheduled by endorsement to this Policy,

provided, however, that service in such position is with the knowledge and consent or at the request of the **Insured**.

T.   "**Policy Period**" means the period set forth in Item 2 of the Declarations or any shorter period that may occur as a result of a cancellation or termination of this Policy.

U.   "**Portfolio Company**" means any entity in which any **Investment Fund** has or had or proposes to have a financial interest pursuant to the investment objectives set forth in any private placement memorandum, prospectus or similar document issued by an **Insured Organization**. **Portfolio Company** shall also mean any entity in which an **Insured Organization** other than an **Investment Fund** has or had or proposes to have a financial interest provided that such financial interest was acquired in connection with an investment in such entity by an **Investment Fund**.

V.   **"Professional Services"** means:

(1)   any advisory, management, administrative or other consultative services performed by an **Insured** for an **Insured Organization** or other third party; provided that any such services rendered to a third party are (i) pursuant to an express contract; (ii) for a fee or other compensation; and (iii) in furtherance of the business objectives of any **Insured Organization**;

(2)   the formation, creation, distribution or sale of securities in, or the management, administration or investment decision of any **Investment Fund**;

(3)   any advisory or other consultative services performed by an **Insured** for any **Portfolio Company**, including but not limited to, advice as to the **Portfolio Company's** capital structure, sale of assets, stock issuance, contemplated financing or capitalization, internal controls, legal compliance programs, software and/or hardware systems, hiring of experts, marketing policies, financial reporting, risk management programs or other operational or business matters; or

(4)   legal services provided by an **Insured Person** as an attorney, but only if such services are performed for an **Insured Organization** and in the **Insured Person's** capacity as an employee of an **Insured Organization**. **Professional Services** shall also include pro bono legal services rendered by an **Insured Person** for indigent clients or for non-profit public interest groups; provided that such legal services are rendered with the knowledge and prior written consent of the **Named Insured**.

W.   "**Proposal Form**" means the application for this Policy, any attachments to such application, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this Policy.

**X.** "**Self-Regulatory Organization**" means any association of investment advisors or securities dealers registered under state or federal securities laws or any national securities exchange registered with the Securities Exchange Commission under the Securities and Exchange Act of 1934, as amended, or any similar Canadian or other national or international exchange or commission.

**Y.** "**Wrongful Act**" means any actual or alleged **Employment Practices Wrongful Act** or error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:

(1)     by the **Insured Persons**, in their capacity as such;

(2)     with respect to Insuring Agreement (B)(2), by the **Insured Organization**; or

(3)     with respect to Insuring Agreement (C), by the **Insured Persons** while serving in an **Outside Position**.

## Section IV.   Exclusions

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

**A.** for any actual or alleged:

(1)     bodily injury, sickness, disease, or death of any person;

(2)     damage to or destruction of any tangible property, including the loss of use thereof; or

(3)     mental anguish, emotional distress, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel or slander; provided, however, that part (3) of this exclusion shall not apply to any **Employment Practices Claim**;

**B.** based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any **Wrongful Act** or **Interrelated Wrongful Acts**, or any fact, circumstance or situation which has been the subject of any notice or **Claim** given under any other policy of which this Policy is a renewal or replacement;

**C.** brought or maintained by or on behalf of any **Insured**, provided, however, this exclusion shall not apply to:

(1)     any **Claim** brought by any security holder of an **Insured Organization** whether directly or derivatively, if the security holder bringing such **Claim** is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any **Insured**;

(2)     any **Employment Practices Claim**;

(3)     any **Claim** brought by any **Insured Person** where such **Claim** is in the form of a cross-claim or third party claim for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded by the terms of this Policy;

(4)     any **Claim** brought by the bankruptcy trustee or examiner of an **Insured Organization** or any assignee of such bankruptcy trustee or examiner, or any receiver, conservator, rehabilitator, or liquidator or comparable authority of an **Insured Organization**;

(5)     any **Claim** brought by any **Insured Person** who is no longer employed, contractually or otherwise, by an **Insured Organization**; provided, however, that when such **Claim** is made and maintained, such natural person is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured**;

(6)     any **Claim** made in a jurisdiction outside of the United States of America, Canada or Australia by an **Insured Person** of an **Insured Organization** created in such jurisdiction;

(7)     any **Claim** brought by an **Insured Organization**, where prior to bringing such **Claim**, independent legal counsel for such **Insured Organization** has stated in a written opinion that a failure to bring or maintain such **Claim** would be a breach of fiduciary duty owed by any **Insured** to such **Insured Organization** or investors in such **Insured Organization**; or

(8)     any **Claim** brought by an **Insured Person** serving as a member of an **Investment Fund's** advisory board, advisory committee or any similar board or committee; provided, however, that such **Insured Person** is serving in such capacity at the request and direction of a security holder of an **Investment Fund;**

**D.**   brought about or contributed to by:

(1)   any **Insureds** gaining any profit, advantage or remuneration to which they were not legally entitled; or

(2)   the deliberately fraudulent or criminal acts of any **Insureds**;

provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred; and this exclusion shall not apply to coverage provided under Insuring Agreement I.B(1);

**E.**   for: (1) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or (2) any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste;

Pollutants include, but are not limited to, any solid, liquid, gaseous or thermal irritant or contaminant, including without limitation smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products, waste and any electric, magnetic or electromagnetic field of any frequency. Waste includes, but is not limited to, material to be recycled, reconditioned or reclaimed;

**F.**   for, based upon, arising from, or in any way related to any **Wrongful Act** of any **Insured Person** serving as a director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board or other equivalent executive or management position of any entity other than the **Insured Organization** even if such service is at the direction or request of the **Insured Organization**, provided, however, this exclusion does not          apply to any **Claim** for any **Wrongful Act** of an **Insured Person** while serving in an **Outside Position**;

**G.**   for any **Wrongful Act** of any **Insureds** in connection with the activities of any **Insured(s)** as a fiduciary for, or in the administration of, any pension or welfare plans of an **Insured Organization** or a **Portfolio Company**;

**H.**   based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding involving any **Insured** as of the date stated in Item 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in such proceeding;

**I.**   for any **Wrongful Act** of any **Operating Entity** or the **Insured Persons** of such **Operating Entity** occurring:

(1)   prior to the date such entity became an **Operating Entity**;

(2)   subsequent to the date such entity became an **Operating Entity** or was merged with an **Insured Organization** which, together with a **Wrongful Act** occurring prior to the date such entity became an **Operating Entity** or was merged with an **Insured Organization**, would constitute **Interrelated Wrongful Acts**; or

(3)   subsequent to the date an **Insured** ceased to possess, directly or indirectly, the power to control, manage or direct such **Operating Entity**;

**J.**   solely with respect to the **Insured Organization**, for, based upon, arising from, or in any way related to any actual or alleged breach of contract or agreement, whether written or oral; provided, however, this exclusion shall not apply to:

(1)   liability for **Loss** which would have attached even in the absence of such contract or agreement;

(2)   any actual or alleged breach of any contract describing or calling for **Professional Services**;

(3)   any indemnification obligation between an **Insured Organization** and an **Insured Person**; or

(4)   any actual or alleged breach of an **Investment Fund's** partnership agreement, articles of incorporation, by-laws, trust indenture or similar organizational or constituting document;

**K.**   for, based upon, arising from, or in any way related to any public offering of securities of an **Insured Organization** or the purchase or sale of such securities subsequent to such public offering; provided, however, that this exclusion shall not apply to the offering of securities of an **Insured Organization** that is exempt from registration under the Securities Act of 1933;

**L.**   which is insured in whole or in part by another valid and collectible policy or policies (except with respect to any excess beyond the amount or amounts of coverage under such other policy or policies), whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise;

**M.**   for any actual or alleged violation by an **Insured** of workers' compensation, unemployment compensation, disability benefits, or social security laws, or the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act of 1970, the Workers' Adjustment and Retraining Notification Act, or any similar federal, state, local or foreign law except a **Claim** alleging retaliation for the exercise of any rights under such laws.

NOTE:    For the purpose of determining the applicability of the aforementioned Exclusion D., it is understood and agreed that:

(1)   the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person**; and

(2)   only the **Wrongful Acts** of any past, present or future **Executive Officer** shall be imputed to the **Insured Organization**.

**Section V.     Limit of Liability**

**A.**      The **Insurer** shall be liable to pay one hundred percent (100%) of **Loss** in excess of the applicable Retention amount stated in Item 4 of the Declarations up to the Limit of Liability stated in Item 3 of the Declarations.

**B.**      **Costs of Defense** shall be part of, and not in addition to, the Limit of Liability stated in Item 3 of the Declarations, and such **Costs of Defense** shall serve to reduce the Limit of Liability.

**C.**      The **Insurer's** liability for all **Loss** shall be the amount shown in Item 3 of the Declarations which shall be the maximum aggregate Limit of Liability of the **Insurer** for the **Policy Period**, regardless of the time of payment or the number of **Claims**.

**Section VI.     Retention**

**A.**      One Retention shall apply to each and every **Claim**.   The **Insured Organization** shall be responsible for, and shall hold the **Insurer** harmless from, any amount within the Retention.  With respect to Insuring Agreement B.(1), if the **Insured Organization** is permitted or required by the **Insured Organization** agreement, by-laws, certificate of incorporation, or similar document to indemnify the **Insured Persons** for **Loss**, or to advance **Costs of Defense** on their behalf, and does not in fact do so other than for reasons of **Financial Insolvency**, then the **Insurer** shall pay all such **Loss** on behalf of such **Insured Persons** subject to the Retention applicable to Insuring Agreement B.(1) and all terms and conditions of this Policy. For purposes of this paragraph, any partnership agreement, operating agreement, shareholder and/or board of director's resolutions of an **Insured Organization** shall be deemed to provide indemnification and advancement for such **Loss** to the fullest extent permitted or required by the law.

**B.**      More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** of one or more **Insureds** shall be considered a single **Claim**, and only one Retention shall be applicable to such single **Claim**.  All such **Claims** constituting a single **Claim** shall be deemed to have been made on the earlier of the following dates: (1) the earliest date on which any such **Claim** was first made; or (2) the earliest date on which any such **Wrongful Act** or **Interrelated Wrongful Acts** was reported under this Policy or any other policy providing similar coverage.

**C.**      In the event **Loss** arising from a single **Claim** is subject to more than one Retention, the largest Retention amount set forth in Item 4 of the Declarations shall be the maximum Retention applicable to such **Claim**.

**Section VII.     Costs of Defense and Settlements**

**A.**      No **Costs of Defense** shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld. The **Insurer** shall not be liable for any **Costs of Defense**, settlement, assumed obligation or admission to which it has not consented.  Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

**B.**      The **Insurer** shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this Policy. The **Insurer** may make any investigation it deems appropriate. However, it shall be the duty of the **Insureds**, not the **Insurer**, to defend any **Claim** provided that the **Insureds** shall only retain counsel as is mutually agreed upon with the **Insurer**.

C.    The **Insurer** shall advance on behalf of the **Insureds**, excess of any applicable Retention, covered **Costs of Defense** which the **Insureds** have incurred in connection with covered **Claims** made against them prior to disposition of such **Claims** and within ninety (90) days of receipt and review of the invoices containing such **Insured's Costs of Defense**, provided that to the extent it is finally established that any such **Costs of Defense** are not covered under this Policy, the **Insureds**, severally according to their relative interests, agree to repay the **Insurer** such non-covered **Costs of Defense**. Any amounts advanced by the **Insurer** shall serve to reduce the Limit of Liability stated in Item 3 of the Declarations to the extent they are not in fact repaid.

D.    The **Insureds** shall as a condition precedent to their rights under this Policy, give to the **Insurer** all information and cooperation as the **Insurer** may reasonably require and shall do nothing that may hinder the **Insurer's** position or its potential or actual rights of recovery.

## Section VIII.   Notice of Claim

A.    The **Insureds** shall, as a condition precedent to their rights under this Policy, give to the **Insurer** written notice of any **Claim** made against any **Insureds** as soon as practicable after the **Named Insured's** Chief Financial Officer or General Counsel first becomes aware of such **Claim** but in no event later than: (i) ninety (90) days after the termination of the **Policy Period**; or (ii) the expiration date of the **Discovery Period**, if applicable.

B.    If during the **Policy Period** or **Discovery Period** any **Insureds** become aware of a specific **Wrongful Act** that may reasonably be expected to give rise to a **Claim** against any **Insureds**, and, if such **Wrongful Act** is reported to the **Insurer** during the **Policy Period** or **Discovery Period** in writing with particulars as to the reasons for anticipating such a **Claim**, the nature and dates of the alleged **Wrongful Act**, the alleged injuries or damages sustained, the names of potential claimants, any **Insureds** involved in the alleged **Wrongful Act** and the manner in which the **Insureds** first became aware of the specific **Wrongful Act**, then any **Claim** subsequently arising from such specific **Wrongful Act** duly reported in accordance with this paragraph shall be deemed under this Policy to be a **Claim** made during the **Policy Period** or **Discovery Period**.

C.    All notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail, or by email, properly addressed to the appropriate party. Notice to the **Insured(s)** may be given to the **Named Insured** at the address shown in Item 1 of the Declarations. Notice to the **Insurer** of any **Claim** or **Wrongful Act(s)** shall be given to the **Insurer** at the following address:

GREAT AMERICAN INSURANCE GROUP
EXECUTIVE LIABILITY DIVISION
CLAIMS DEPARTMENT
1515 Woodfield Road, Suite 500
Schaumburg, Illinois 60173

Or

By Email: ELDClaims@gaig.com

Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

## Section IX.    General Conditions

**A.    Cancellation or Non-Renewal**

(1)    This Policy may be canceled by the **Named Insured** at any time by written notice to the **Insurer**.  In the event the **Named Insured** cancels this Policy for reasons other than the downgrade of the **Insurer's** rating by A.M. Best, the **Insurer** shall retain the customary short rate premium.  However, if the **Named Insured** cancels the Policy due to a downgrade of the **Insurer's** rating to below [A-], the **Insurer** shall refund any unearned premium on a pro rata basis.  Payment of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

(2)    The **Insurer** may cancel this Policy for non-payment of premium by sending not less than ten (10) days notice to the **Named Insured** at its last known address. The **Insurer** may not otherwise cancel this Policy.

(3)    If the **Insurer** elects not to renew this Policy, the **Insurer** shall provide the **Named Insured** with no less than sixty (60) days advance notice thereof.

**B.    Action Against the Insurer**

(1)    No action shall be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, and until the **Insured's** obligation to pay shall have been finally determined by an adjudication against the **Insured** or by written agreement of the **Insured**, claimant and the **Insurer**.

(2)    No person or organization shall have any right under this Policy to join the **Insurer** as a party to any **Claim** against the **Insureds** nor shall the **Insurer** be impleaded by any **Insured** or their legal representative in any such **Claim**.

**C.    Merger or Acquisition**

If, during the **Policy Period**, an **Insured Organization** acquires the assets of another entity other than a **Portfolio Company**, by merger or otherwise, and the acquired assets of such other entity exceed twenty-five percent (25%) of the assets of such **Insured Organization** as of the inception date of the Policy, written notice thereof shall be given to the **Insurer** as soon as practicable, but in no event later than ninety (90) days from the effective date of the transaction, together with such information as the **Insurer** may request.  Premium adjustment and coverage revisions shall be effected as may be required by the **Insurer**.

**D.    Run-Off Coverage**

(1)    Acquisition of **Named Insured**

If, during the **Policy Period**, a transaction occurs wherein another entity gains control of the **Named Insured** through the ownership of more than fifty percent (50%) of the voting stock of the **Named Insured**, or the **Named Insured** merges into another entity or consolidates with another entity such that the **Named Insured** is not the surviving entity, then:

(a)    the **Named Insured** must give written notice of such transaction to the **Insurer** within ninety (90) days after the effective date of such transaction and provide the **Insurer** with such information in connection therewith as the **Insurer** may deem necessary;

(b)      this Policy shall only apply to **Wrongful Acts** actually or allegedly committed on or before the effective date of such transaction; and

(c)      the entire premium for this Policy shall be deemed earned as of the date of such transaction;

provided, however, this condition shall not apply if the transaction is a reorganization or restructuring of security ownership of the **Named Insured** among **Insured Persons**.

(2)      Withdrawal, Resignation, Replacement or Substitution of **General Partner**

If, during the **Policy Period,** the **General Partner** of an **Investment Fund** withdraws, resigns, is replaced or is substituted with another entity that is not an **Operating Entity,** then:

(a)      the **Named Insured** must give written notice of such transaction to the **Insurer** within ninety (90) days after the effective date of such transaction and provide the **Insurer** with such information in connection therewith as the **Insurer** may deem necessary; and

(b)      with respect to coverage for such **Investment Fund**, this Policy shall only apply to **Wrongful Acts** actually or allegedly committed on or before the effective date of such transaction.

(3)      Sale of **Portfolio Company**

If before or during the **Policy Period** an organization ceases to be a **Portfolio Company**, coverage with respect to: (i) an **Insured Person** serving in an **Outside Position** of such **Portfolio Company**; or (ii) any **Professional Services** rendered by an **Insured** shall continue until termination of this Policy but only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Portfolio Company**.

An entity ceases to be a **Portfolio Company** when all **Insured Organizations** no longer maintain a financial interest in such entity.

**E.    Coverage Extensions**

(1)      Spousal/Domestic Partner Provision

In the event a **Claim** made against an **Insured Person**, which is otherwise within the coverage afforded by this Policy, also includes a **Claim** against such **Insured Person's** lawful spouse or **Domestic Partner** solely by reason of (a) such spousal or **Domestic Partner** status, or (b) such spouse or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**, then any and all **Loss** for which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which such **Insured Person** of the spouse or **Domestic Partner** becomes legally obligated to pay as a result of the **Claim** made against such **Insured Person**.

All terms and conditions of this Policy, including the Retention, applicable to **Loss** sustained by such **Insured Person** in the **Claim** shall also apply to loss sustained by such spouse or **Domestic Partner**. The extension of coverage afforded by this Section IX.E. shall only apply to the extent the **Claim** arises out of any actual or alleged **Wrongful Act** of an **Insured Person**.

(2)     Worldwide Provision

The coverage provided under this Policy shall apply worldwide.  The term **Insured Persons** is deemed to include individuals who serve in equivalent positions in foreign **Operating Entities**.

(3)     Estates and Legal Representatives

The coverage provided by this Policy shall also apply to the estates, heirs, legal representatives or assigns of any **Insured Persons** in the event of their death, incapacity or bankruptcy, but only for **Claims** arising out of any actual or alleged **Wrongful Acts** of any **Insured Persons**.

## F.     Subrogation

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all of the **Insureds**' rights of recovery and the **Insured Organization** and **Insured Persons** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the **Insurer** to effectively bring suit in the name of any **Insured Persons** or the **Insured Organization**.

## G.     Allocation

If both **Loss** covered under this Policy and **Loss** not covered under this Policy are incurred in connection with any **Claim**, the **Insured Person(s)**, the **Insured Organization** and the **Insurer** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered **Loss**.

If there can be an agreement on an allocation of **Loss**, the **Insurer** shall advance, on a current basis, **Costs of Defense** allocated to covered **Loss**. If there can be no agreement on an allocation of **Loss**:

(1)     no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

(2)     the **Insurer** shall advance on a current basis **Costs of Defense** which the **Insurer** believes to be covered under this Policy until a different allocation is negotiated, arbitrated or judicially determined; and

(3)     the **Insurer**, if requested by the **Insured Persons** and/or the **Insured Organization**, shall submit such dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel, which shall consist of one arbitrator selected by the **Insured Persons** and/or the **Insured Organization**, one arbitrator selected by the **Insurer** and a third independent arbitrator selected by the first two arbitrators.

Any negotiated, arbitrated or judicially determined allocation of **Costs of Defense** on account of a **Claim** shall be applied retroactively to all **Costs of Defense** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Costs of Defense** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim**.

## H.     Assignment

Assignment of interest under this Policy shall not bind the **Insurer** until its consent is endorsed hereon.

**I.**     **Conformity to Statute**

Any terms of this Policy which are in conflict with the terms of any applicable laws are hereby amended to conform to such laws.

**J.**     **Entire Agreement**

By acceptance of this Policy, the **Insureds** and the **Insurer** agree that this Policy (including the Declarations, **Proposal Forms** submitted to the **Insurer** and any information provided therewith) and any written endorsements attached hereto constitute the entire agreement between the parties.  The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement.

**K.**     **Named Insured Represents Insured**

By acceptance of this Policy, the **Named Insured** shall be designated to act on behalf of the **Insureds** for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, the cancellation or non-renewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

**L.**     **Representative of the Insurer**

Great American Insurance Group, Executive Liability Division, P.O. Box 66943, Chicago, Illinois 60666 shall act on behalf of the **Insurer** for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, provided, however, notice of **Claims** shall be given pursuant to Section VIII. of the Policy.

**M.**     **Order of Payments**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this Policy, then the **Insurer** shall in all events:

(1)     first, pay **Loss** for which coverage is provided under Insuring Agreement A of this Policy; then

(2)     only after payment of **Loss** has been made pursuant to Insuring Agreement A of this Policy, with respect to whatever remaining amount of the Limit of Liability is available after such payment, the **Insurer** shall pay such other **Loss** for which coverage is provided under any other applicable Insuring Agreements in Section I of this Policy.

The **Financial Insolvency** of any **Insured** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this Policy.

**N.**     **Representations and Severability**

It is agreed by the **Insureds** that the particulars and statements contained in the **Proposal Form** and any information provided therewith (which shall be on file with the **Insurer** and be deemed attached hereto as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated in and constituting a part of the Policy.  It is further understood and agreed by the **Insureds** that the statements in the **Proposal Form** or in any information provided therewith are their representations, and that this Policy is issued in reliance upon the truth of such representations. In the event any of the statements, representations or information in the **Proposal Form** and/or any information provided therewith (hereafter referred to as "Facts"), are not true and accurate:

(1)     There shall be no coverage for any **Claims** made pursuant to Insuring Agreement A. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**.  The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement A;

(2)     There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.1. of this Policy to the extent an **Insured Organization** indemnifies any **Insured Person** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form,** whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**.  For purposes of this paragraph (2), knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**;

(3)     There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.2. of this Policy if the person(s) who signed the **Proposal Form** for this coverage or any **Insured Person** who is or was a past, present or future **Executive Officer** of the **Named Insured** had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**;

(4)     There shall be no coverage for any **Claims** made pursuant to Insuring Agreement C. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**.  The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement C.; and

(5)     Solely with respect to Insuring Agreement A, under no circumstances shall the **Insurer** be entitled to rescind such coverage.

In witness whereof the **Insurer** has caused this Policy to be signed by its President and Secretary and countersigned, if required, on the Declarations page by a duly authorized agent of the **Insurer**.

### GREAT AMERICAN INSURANCE GROUP®

*President*                                    *Secretary*